Richard CARROLL et al.,
Plaintiffs-Appellants,

v.

PROTECTION MARITIME INSUR-
ANCE CO., LTD., et al.,
Defendants-Appellees.

No. 74–1309.

United States Court of Appeals,
First Circuit.

Argued Dec. 3, 1974.

Decided Feb. 19, 1975.

Alan R. Hoffman, Boston, Mass., with whom Michael B. Latti and Kaplan, Latti & Flannery, Boston, Mass., were on brief, for plaintiffs-appellants.

Solomon Sandler, Gloucester, Mass., with whom Sandler, Sandler & Laramee, Gloucester, Mass., was on brief, for defendants-appellees.

Before COFFIN, Chief Judge, and ALDRICH and McENTEE, Circuit Judges.

COFFIN, Chief Judge.

Plaintiffs, seamen and commercial fishermen, appeal the dismissal of their complaint against defendants, the marine protection and indemnity insurers of fishing vessels on which plaintiffs work.[1] Plaintiffs assert that because they have in the past brought personal injury actions against their employers, they are now being denied employment through the practices of defendants. The de-fendants are alleged to have "listed" plaintiffs, i. e., to have notified vessel owners that some of the plaintiffs ("class A") would not be covered by defendants' insurance policies and that others ("class B") would be covered, but at much higher rates. Since marine insurance was not, allegedly, readily available elsewhere, vessel owners were forced to discharge or refuse employment to plaintiffs. Defendants' alleged purpose was to reduce insurance claims and cost of settlements, and, accordingly, to reduce operating costs enabling defendants to sell marine insurance at an artificially low rate. The intended result was not only the discharge of plaintiffs from existing jobs and inability of plaintiffs to obtain new jobs, but a conspiracy in restraint of trade.

This basic set of allegations is distilled from a "Further Amended Complaint" of fifty pages and twelve counts which need not be summarized in any detail. It suffices to say that the complaint embraced several theories: a maritime cause of action for tortious interference with plaintiffs' contractual and advantageous business relations—within admiralty jurisdiction, 28 U.S.C. § 1333; a cause of action for conspiring to violate the anti-trust laws—within federal question jurisdiction, 28 U.S.C. § 1331; and a cause of action within diversity jurisdiction, 28 U.S.C. § 1332.

The district court held (1) that admiralty jurisdiction was lacking, there being no allegation of tortious activity occurring on navigable waters; (2) that diversity jurisdiction was lacking, two of the defendants being citizens of the same state as plaintiffs; and (3) that plaintiffs lacked standing to sue for anti-trust law violations, their interest as employees of vessel owners being too remote and their injury too indirect.

■ We first address the question whether a cause of action for tortious interference with a seaman's present or

1. Specifically, defendants are an English insurance company, Protection Maritime Insurance Co., Ltd.; a Massachusetts marine insurance broker, Trans-Atlantic Marine, Inc., which places business with Protection Maritime; and a Massachusetts citizen, Enos, who is the principal officer of Trans-Atlantic and an officer and director of Protection Maritime.

**6**

prospective employment against the insurer of the seaman's employer is within admiralty jurisdiction. That the allegations in the complaint before us adequately describe a tort is clear. *E. g.*, Pino v. Trans-Atlantic Marine, Inc., 358 Mass. 498, 265 N.E.2d 583 (1970); A.L.I. Restatement of Torts 2d, § 766. Any question as to privilege would be a matter of defense, *see* Prosser, Law of Torts (Fourth ed.), § 130, at p. 953, and is not suggested by the complaint, which alleges a knowing and intentional interference without just cause.

■ The critical issue is that of admiralty jurisdiction. The black letter law as to maritime torts is familiar lore:

"Determination of the question whether a tort is 'maritime' and thus within the admiralty jurisdiction of the federal courts has traditionally depended upon the locality of the wrong. If the wrong occurred on navigable waters, the action is within admiralty jurisdiction; if the wrong occurred on land, it is not." Executive Jet Aviation, Inc. v. City of Cleveland, 409 U.S. 249, 253, 93 S.Ct. 493, 497, 34 L.Ed.2d 454 (1972).

*See also* Victory Carriers, Inc. v. Law, 404 U.S. 202, 205 n. 2, 92 S.Ct. 418, 30 L.Ed.2d 383 (1971).

■ Before we examine whether or not the locality rule recognized by *Executive Jet Aviation* and its ancestors precludes admiralty jurisdiction in such a case as this, we observe that if it does, it would be on the basis of tradition alone and not reason or policy. For a contract for services between a seaman and a vessel owner is at the heart of maritime relationships. Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). Suit for breach of such contract lies in admiralty. There is no apparent reason or policy for requiring a seaman who wishes to sue both his employer for breach and a third party who provoked the breach to proceed in different courts. Not only would such a requirement result in piecemeal, bifurcated litigation, but the admiralty goal of uniformity in dealing with maritime

matters would be frustrated. Seamen's rights against those who tortiously interfere with their seagoing employment would vary from port to port or state to state. Fears of open-ended expansion of admiralty jurisdiction through recognition of causes like that alleged here would not seem well founded. The essential maritime nexus would be not only present but dominant. Finally, since the tort, as here applied, by definition involves the disruption or foreclosing of a seagoing relationship, the impact is of necessity a maritime one wherever the act of interfering may have taken place. The locale of the act is irrelevant to the harm done. Indeed, no contrary policy or rationale has been noted by appellee or the district court, who relied solely on the time honored formulation of the locality rule relating to maritime torts.

*Executive Jet Aviation* established a "locality plus" rule in reaction to the absurdities inherent in predicating admiralty jurisdiction on the locality rule as the sole test. In so doing, it added, significantly, we think:

"another indictment of that test is to be found in the number of times the federal courts and the Congress, in the interests of justice, have had to create exceptions to it in the converse situations—*i. e.*, when the tort has no maritime locality, but does bear a relationship to maritime service, commerce, or navigation." 409 U.S. at 259, 93 S.Ct. at 500.

The Court referred to O'Donnell v. Great Lakes Dredge & Dock Co., 318 U.S. 36, 63 S.Ct. 488, 87 L.Ed. 596 (1943) where it sustained the judicial "application of the Jones Act . . . to injuries to a seaman on land, because of the seaman's connection with maritime commerce", *id.*, and to Gutierrez v. Waterman S. S. Corp., 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963), where the doctrine of unseaworthiness was similarly applied. *Id.*, at 260, 83 S.Ct. at 500. More pertinently, the Court cited the Second Circuit precursor of *Gutierrez*, Strika v. Netherlands Ministry of Traffic, 185

F.2d 555 (1950), where Chief Judge Hand, in dealing with a longshoreman's action against a shipowner for injury suffered on land, based on breach of the implied warranty to furnish seaworthy equipment—a tort, recognized the challenge to maritime jurisdiction. He wrote for the court: "[S]uch a tort, arising as it does out of a maritime 'status' or 'relation', is cognizable by the maritime law whether it arises on sea or on land."

Three decades earlier, Judge Hand, as a district judge, had dealt with a case where a vessel owner ("The Polish Company") had allegedly compelled the charterer of its vessel to break a contract with libellants. The Poznan, 276 F. 418 (S.D.N.Y.1921). Addressing the question of admiralty jurisdiction, he wrote,

"At least for the purposes of this case I may assume that the injury must be maritime in its character as much as though the case sounded in contract. The injury here was the breach of the contract of carriage itself, the effective cause of which was the act of the Polish Company. Obviously, if that contract was maritime enough in its character to base a libel upon it in contract, the injury resulting from the wrongful act on shore was as maritime, because it was the same thing." Id., at 433, 434.

Similar analysis, drawing on both Strika and The Poznan, has been more recently applied within the Second Circuit. In Cocotos Steamship of Panama v. Sociedad Maritima Victoria S.A. Panama, 146 F.Supp. 540 (S.D.N.Y.1956), Judge Sugarman dealt, by way of dictum, with a libel against two corporations for conspiring to cause a third corporation to breach a charter-party. He characterized the defense of lack of maritime jurisdiction as "unstable", Id., at 545, relying on the language of The Poznan which we have quoted. In Castillo v. Argonaut Trading Agency, 156

F.Supp. 398 (S.D.N.Y.1957), Judge Dimock found admiralty jurisdiction over a libel by seamen charging officers of their employer with having caused their false imprisonment in Australia, relying on Kyriakos v. Goulandris, 151 F.2d 132 (2d Cir. 1945), which had held justiciable in admiralty an assault on shore against a crew member. The circuit court had been influenced by the language in O'Donnell, supra, 318 U.S. at 42, 63 S.Ct. at 492, that "the admiralty jurisdiction over the suit depends not on the place where the injury is inflicted but on the nature of the service and its relationship to the operation of the vessel plying in navigable waters."

In Kamara v. S. Livanos & Co., 97 F.Supp. 435 (S.D.N.Y.1951), Judge Kaufman held that an allegation that libellants had been blacklisted was properly before the admiralty court since it "deal[t] with seamen's employment." Id., at 438.[2] And the Second Circuit, holding injunctive relief unavailable to prevent the commission of a maritime tort also said, "We assume . . ., without deciding, that picketing which prevents a vessel's being unloaded when the owner is powerless to take action that will end the picketing, is a tort . . . and also that although the actions of the unions took place on land, the tort is maritime since its effect was felt on the navigable waters of New York harbor where the cargo continued to be held on the Cleopatra." Khedivial Line, S.A.E. v. Seafarers' International Union, 278 F.2d 49, 52 (1960).

Khedivial suggests an alternative kind of analysis. Such cases as Strika, The Poznan, and their progeny find a sufficient maritime nexus to support jurisdiction in the fact that the allegedly tortious conduct had its source in maritime operations or relationships. Khedivial looked to the impact or effect of the tort on the vessel. This analytical approach is pursued elsewhere. Facts converse to

---

**2.** The same libellant fared less well two weeks later before Judge Clary, who ruled in Kamara v. The Atlantic Emperor, 97 F.Supp. 722, 725 (E.D.Pa.1951), that a cause of action for blacklisting "clearly is not an action cognizable in admiralty since no part of it is alleged to have taken place on navigable waters."

those in *Khedivial* were presented in O'Connor & Co. v. City of Pascagoula, 304 F.Supp. 681 (S.D.Miss.1969), where a stevedore alleged that respondent city's fire marshal wrongfully prevented it from continuing to load explosives on several vessels, causing the shippers to terminate their contract with the stevedore. The court found two bases for maritime jurisdiction. One was the fact that the alleged action of the fire marshal interfered with a maritime contract of transportation of goods, the same analysis used by Judge Hand in *The Poznan*. The other ground was the impact of the inducement of breach, "causing the vessels to sail light and late." *Id.*, at 683. The court in *O'Connor* led up to its conclusion by referring to the "locality" test, rejecting its mechanical application, and observing that the critical focus should not be "where the wrongful act or omission has its inception, but where the impact of the act or omission produces [the] injury." *Id.*, at 683. The reference to the above cited page in *O'Connor* by the Court in *Executive Jet Aviation*, 409 U.S. at 257 n. 6, 93 S.Ct. 493,[3] lends weight to this analysis.

*O'Connor* in turn found support in two recent cases in the Southern District of New York. In the first of these, Upper Lakes Shipping, Ltd. v. International Longshoremen's Ass'n, 33 F.R.D. 348 (1963), Judge Bonsal found admiralty jurisdiction over a cause of action by a shipping company against two unions for unlawfully picketing its vessels and inducing grain elevator and stevedoring personnel to refuse to participate in loading and unloading operations, all with the purpose of forcing plaintiff to discharge certain seamen. The court held that the alleged activities "wrongfully interfered with the plaintiff's shipping business, including the handling of cargoes and the free operation of its ships on navigable waters. This is sufficient to confer Admiralty jurisdiction on

this Court, even though the tortious acts may have taken place on land alongside plaintiff's vessels." *Id.*, at 350. Similarly, Judge McGohey in Orient Mid-East Lines, Inc. v. Albert E. Bowen, Inc., D.C., 255 F.Supp. 627 (1966), held that "the inducement of a breach of a maritime contract which causes a light sailing is indeed a maritime tort." *Id.*, at 628.

So, in the case at bar, it can also be said that the impact of defendants' alleged actions, at least where existing employment was terminated, was felt in the operations of the affected vessels at sea. They not only have sailed without the black-listed plaintiffs but without the owners and officers of the affected vessels having exercised their unrestricted choice of crew members.

The district court, while acknowledging that the Second Circuit followed the test of relationship between the injury and vessel operations, rather than the historic locality test, interpreted us as accepting the traditional view, citing Fireman's Fund American Insurance Co. v. Boston Harbor Marina, Inc., 1 Cir., 406 F.2d 917, 919 (1969), where, in dealing with the responsibility for the destruction by fire of a yacht in winter storage, we affirmed the holding of the district court "that there was no admiralty jurisdiction for a claim sounding in tort because of its strictly land-based nature." We see no reason to question that holding. But we do not read into it the implication that torts, to draw on the passage we have quoted from *Executive Jet Aviation, supra*, which have "no maritime locality", but have an intimate "relationship to maritime *service*, commerce, or navigation" [emphasis ours] should be excluded from admiralty jurisdiction.

The tort alleged in this case seems to us so interwoven with present and potential maritime contractual relationships—traditional concerns of admi-

---

**3.** Similarly referenced was J. W. Peterson Coal & Oil Co. v. United States, 323 F.Supp. 1198, 1201 (N.D.Ill.1970), where the action of the United States in supplying a dredging contractor with maps and information as to river depths and dredging locations was held sufficient to invoke admiralty jurisdiction in tort.

ralty—as to fall within that jurisdiction. Moreover, as we have noted, the impact of such a tort as this, while felt by the blacklisted seamen, is equally manifest in the operations of the affected vessels. We construe the language and references in *Executive Jet Aviation*, which we have noted, to recognize this kind of exception to the locality test.[4] We therefore hold that the amended complaint states a cause of action cognizable in admiralty. We add that, because of the historic unavailability of equitable relief in admiralty, the plaintiffs' prayer for injunctive relief cannot be granted, even should they prevail on the merits.

We need not reach the question of diversity jurisdiction as the plaintiffs may proceed in admiralty.

We now turn to the anti-trust claims. The complaint alleged in essence two kinds of anti-trust violations. One was a conspiracy to reduce defendants' operating costs, through "listing" plaintiffs, and then sell marine insurance at discriminatory, artificially reduced rates to selected vessel owners in order to monopolize and restrain trade. The other alleged anti-trust activity was a conspiracy to threaten and coerce vessel owners not to hire plaintiffs, *i. e.*, a secondary boycott.

■■ The district court, relying on a number of lower court cases involving employees of companies which had been allegedly injured by anti-trust violations, focused on the employee-employer relationship in finding that the plaintiffs lacked standing. We see the injuries here as more proximately related to the alleged unlawful behavior. *See* Radovich v. National Football League, 352 U.S. 445, 435–55, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); Nichols v. Spencer Int'l Press, Inc., 371 F.2d 332 (7th Cir. 1967); *cf.* Nationwide Auto Appraiser Serv. v. Ass'n of C. & S. Co., 382 F.2d 925 (10th Cir. 1967). However, we do not pass on the issue because there is a more fundamental defect in the allegations. They state no cognizable substantive violation of the anti-trust laws. The gravamen of the first claim is that there was price discrimination in the marine insurance business. But the charge, taken in its most favorable light, as required in this context, does not make out a violation of the Robinson Patman Act § 2(a), 15 U.S.C. § 13. A seller cannot violate § 2(a) unless he has sold similar commodities to different purchasers at different prices, *see, e. g.*, FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385 (1960); *see also* P. Areeda, Antitrust Analysis, 845 (2d ed. 1974). Here the claim is that the defendants conspired to and did sell marine insurance on the same conditions and at the same prices (for differing commodities) to different purchasers. No claim of price discrimination is stated.

■ As for the allegations that, independent of price discrimination, defendants sought to create an unlawful boycott of certain classes of seamen, the allegedly unlawful activity is directed exclusively at the labor market, a market which the anti-trust acts do not govern: "the labor of a human being is not

---

4. Apart from relying on the general locality test for admiralty tort jurisdiction, appellees cite only four cases said to be closely in point. One is Kamara v. The Atlantic Emperor, 97 F.Supp. 722 (E.D.Pa.1951), referred to in n. 2, *supra*, and which simply declared that the alleged blacklisting of crew members had not occurred on navigable waters. This we find close on point but not persuasive. Clinton v. International Organization of Masters, 254 F.2d 370 (9th Cir. 1958), involved, *inter alia*, a claim of tortious interference with a contract between a union member and his local union governing allocation of available jobs. The court held the contract not maritime in nature and further observed that the tort was not alleged to have been committed on navigable waters. We find this less on point and no more persuasive. Finally, two old cases from the Southern District of New York were cited. Marquardt v. French, 53 F. 603 (1893), simply held that, a contract to procure insurance not being a maritime contract, suit for its breach would not lie in admiralty. In Williams v. Providence Washington Ins. Co., 56 F. 159, 160 (1893), the court held that a claim for false representations in inducing purchase of a maritime insurance policy, not "arising upon the water", did not state a maritime tort. *Marquardt* is not in point and *Williams* no more persuasive than the other *ipse dixits*.

a commodity or article of commerce." 15 U.S.C. § 17. *See* Nichols v. Spencer International Press, Inc., *supra*, 371 F.2d at 334–37. The anti-trust claims were, therefore, properly dismissed.

Affirmed in part and reversed in part. Remanded for further proceedings consistent with this opinion.

ALDRICH, Senior Circuit Judge (concurring).

I have some initial reluctance in thinking, particularly with relation to a charge that because of defendant's shore-side conduct a prospective seaman was unable to obtain employment, there is admiralty jurisdiction. There must surely be some limits to such a concept. I find, however, that the same considerations are involved here as I anticipate on the basic issues on the merits. Since the court is willing to read the complaint with liberality in this respect without, I assume, committing itself to precisely what plaintiffs must prove in order to recover, I am content to accept the same approach to jurisdiction.